EMMA D. SNYDER, ADMINISTRATRIX (ESTATE OF SHIRLEY C. SNYDER) *v.* CARL V. PANTALEO

BALDWIN, O'SULLIVAN, DALY, SHEA and BORDON, Js.

Argued February 8—decided March 27, 1956

*Cyril Coleman,* for the appellant (defendant).

*Alexander Winnick,* with whom were *Gilbert H. Winnick* and, on the brief, *Sidney Gimple,* for the appellee (plaintiff).

BALDWIN, J. The plaintiff, as administratrix of the estate of Shirley C. Snyder, brought this action for alleged malpractice against the defendant and had a verdict for damages. The defendant moved to set the verdict aside and for judgment notwithstanding the verdict because it was contrary to the law and the evidence. The trial court denied these motions, and the defendant has appealed. The question is whether there was evidence which reasonably and logically supported the verdict.

Shirley, who lived in West Haven, was sent by her family physician, Dr. Raymond J. Zagraniski, to the defendant, a specialist in radiology practicing in New Haven, for an intravenous pyelogram, a procedure used in diagnosing kidney ailments. An iodine compound called diodrast, which is opaque to roentgen rays, is administered intravenously and outlines the affected parts so that pathological conditions otherwise not observable are disclosed. The procedure is used quite generally, although it is attended with some danger because a small percentage of patients are allergic to the iodine contained in diodrast. Iodine is deleterious to bodily tissues, and there is no known antidote for a systemic reaction to an injection of it. Because of this fact, extreme

caution is required in the administration of diodrast. There are two other methods of kidney diagnosis, but both of them subject the patient to greater hazards than an intravenous pyelogram does. The defendant learned upon taking the history of Shirley that she had no known allergies. So much of the facts are not in dispute.

A physician is under a duty to his patient to exercise that degree of care, skill and diligence which physicians in the same general neighborhood and in the same general line of practice ordinarily possess and exercise in like cases. *Horton* v. *Vickers,* 142 Conn. 105, 113, 111 A.2d 675; *Marchlewski* v. *Casella,* 141 Conn. 377, 380, 106 A.2d 466; *Ardoline* v. *Keegan,* 140 Conn. 552, 556, 102 A.2d 352. Usually, proof of the breach of this duty must rest upon the testimony of an expert witness qualified to state what the particular standard of care requires and to express an opinion that the treatment accorded the patient failed to meet this standard. *Ardoline* v. *Keegan,* supra; *Frogge* v. *Shugrue,* 126 Conn. 608, 612, 13 A.2d 503; *Person* v. *Lilliendahl,* 118 Conn. 693, 695, 172 A. 94; *Huffman* v. *Lindquist,* 37 Cal. 2d 465, 473, 234 P.2d 34; Stryker, Courts & Doctors, p. 84; Herzog, Medical Jurisprudence, § 192. Cases in which the want of care and skill is so obvious as to compel a conclusion of negligence furnish the only exception to this rule. *Slimak* v. *Foster,* 106 Conn. 366, 370, 138 A. 153; *Chubb* v. *Holmes,* 111 Conn. 482, 486, 150 A. 516. The case at bar does not come within the exception.

The evidence submitted to the jury admits of two possible versions of what happened after Shirley was prepared for the examination. The jury could have found from the testimony of the defendant that he made a so-called skin test which produced nothing

to indicate his patient's sensitivity to diodrast. He then injected one cubic centimeter of diodrast intravenously, waited two minutes and administered the remaining nineteen cubic centimeters from a vial containing twenty. When the needle was removed, Shirley began to "flush up" and to sit up in a semi-erect position; she retched and called for water. The defendant immediately began to inject adrenalin, a specific remedy for this condition, but upon observing symptoms of a convulsion he stopped the adrenalin and gave sodium luminal. Shirley became convulsed and violent. After the defendant had treated her and she was quiet, he tried without success to reach Dr. Zagraniski and other doctors. About an hour later, he talked with Dr. Zagraniski, who ordered Shirley removed to St. Raphael's Hospital, where she died the next day. Her death resulted from the administration of the diodrast. Two medical experts testified that the defendant, in following the procedure outlined above, had used that degree of care, skill and diligence which radiologists engaged in the same general practice in the general neighborhood have and exercise. The plaintiff concedes that if the jury accepted the foregoing account of what happened she would not be entitled to a verdict.

The jury, however, could have found that the defendant, when he talked with Dr. Zagraniski later in the morning in question, gave him a substantially different version of what had taken place. Dr. Zagraniski made a note in the hospital records of what the defendant had said. It reads as follows: "This A.M. [Shirley] was seen by [Dr. Pantaleo] who skin-tested her and got a one-plus reaction. He gave her a few cc. [of diodrast] intravenously and then gave her three minims adrenalin for her flush and feeling of weakness. He gave the rest of the

20 cc. of diodrast [and] she went into a convulsion. He gave her some luminal, [I don't know exactly how much] and her convulsing ceased." One of the two experts hereinbefore referred to testified that in his opinion this procedure met the required standard of care, skill and diligence exercised by radiologists in the same general line of practice in the general neighborhood. Consequently, whether the jury adopted one version or the other of the sequence of events, there was testimony in the form of expert opinion that the defendant had exercised the requisite degree of care, skill and diligence. It was within the province of the jury to accept or reject this testimony. However, in rejecting it, the jury could not conclude that the opposite was true. *Walkinshaw* v. *O'Brien,* 130 Conn. 151, 153, 32 A.2d 639; *Edwards* v. *Grace Hospital Society,* 130 Conn. 568, 575, 36 A.2d 273. The plaintiff had, at all times, the burden of proving that the defendant had breached his professional duty. Even though the jury rejected the testimony of the defendant's experts, the plaintiff cannot prevail unless there was positive evidence of an expert nature from which the jury could have reasonably and logically concluded that the defendant was negligent. In this case there was such expert testimony from the defendant himself.

In *Slimak* v. *Foster,* 106 Conn. 366, 370, 138 A. 153, we said: "[W]e are unable to agree with the trial court that the plaintiff's evidence was necessarily so lacking in the expert testimony required by the rule as to thereby defeat his recovery. To be sure, there was no specific expression of opinion that the conduct of the defendant was negligent or unskillful, the expert witnesses being manifestly and naturally cautious in characterization, in the absence of more exact information as to the precise

conditions obtaining at the time of the operation than could be afforded by the plaintiff. This must of necessity be true in many cases, and to demand a positive condemnation of the operator's course as a prerequisite to recovery would, in such cases, be prohibitory of any recovery therein." In the case at bar, there was a difference in the expert testimony upon what constituted proper procedure. Then too, the evidence was not all one way as to what happened in the office of the defendant and what procedure he followed. The jury could have found from his own testimony, and he must be considered a qualified expert, that if a patient has a feeling of flush and weakness after the injection of a few cubic centimeters of diodrast, and adrenalin is administered, the standard of care, skill and diligence exercised by radiologists in private practice in the community required that the remainder of the diodrast should not be administered. While the standard of care, skill and diligence is a matter of expert opinion and knowledge, the determination of the facts concerning the conduct under consideration is always for the jury.

In reviewing the court's ruling on the motions, we must accord to the plaintiff the most favorable inferences and conclusions which the evidence will admit. A trier of fact, whether court or jury, may accept part of the testimony of any witness although it rejects the rest. It cannot, however, cull statements from the testimony of an expert which in and of themselves are not complete but are dependent upon other testimony. With these generally accepted principles in mind, we can state the facts the jury could reasonably and logically have found as follows: The use of diodrast demanded extreme caution because of its dangerous potentialities and

the lack of an antidote. The skin test, so-called, produced a one-plus reaction, which indicated that Shirley was allergic to diodrast locally. The defendant, after observing this reaction, injected intravenously, not one cubic centimeter of the diodrast, the amount customarily used by the physicians who make such a preliminary test, but a few cubic centimeters of the substance. Shirley then showed signs of flush and weakness of sufficient severity to warrant the defendant's giving her three minims of adrenalin. The defendant thereafter administered the remainder of the twenty cubic centimeters of diodrast, and Shirley went into a convulsion. This procedure was contrary to what the defendant himself had stated to be his procedure as a private practitioner and to the procedure followed by other private practitioners in the community. There was, therefore, expert medical testimony to the effect that the procedure as outlined in the hospital record was not consistent with the standard of care, skill and diligence which, according to the defendant's testimony, radiologists practicing in private offices customarily followed in the community. The jury could properly have concluded from this testimony that the defendant was liable in damages.

There is no error.

In this opinion the other judges concurred.